In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00328-CV**
_____

**IN THE INTEREST OF A.R. JR.**

_____

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 21-09-12252-CV**
_____

**MEMORANDUM OPINION**

After a bench trial, Father appeals an order terminating his parental rights to his one-year-old son, A.R. Jr. (A.R.)[1] The order also terminated the parental rights of A.R.'s mother (Mother).[2] We affirm.

---

[1] To protect the identity of the child, we use pseudonyms to refer to the child and his parents. *See* Tex. R. App. P. 9.8(b)(2).

[2] In this case, Mother executed an Affidavit of Voluntary Relinquishment of Parental Rights to the Department of Family and Protective Services, and she is not a party to this appeal. We discuss Mother only as necessary for context.

Background

On September 3, 2021, the Department of Family and Protective Services (the Department) filed an Original Petition for Protection of a Child, For Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The petition named A.R. as the child of the suit and Mother and Father as A.R.'s parents. When the petition was filed, A.R. was a month old.

The petition was supported by an affidavit from a Child Protective Services (CPS) worker and representative of the Department. The affidavit stated that, on August 9, 2021, the Department received a referral for neglectful supervision of A.R. by Mother and Father. According to the affidavit, the report stated that Mother and Father had previously had parental rights terminated, Father had a history of using methamphetamine, and Mother had Post Traumatic Stress Disorder (PTSD) and other mental health diagnoses and was not taking her medication.

According to the affidavit, the Department representative arrived at Mother and Father's residence on August 9, 2021, and Mother exited the residence with an "aggressive" demeanor. When the representative explained to Mother he was with CPS and needed to speak with her about a case that was called in, Mother responded that she wanted to know "who is calling in these cases[,]" and she wanted to know how she "is getting a case if the baby is still currently in the NICU." The affidavit

2

stated that Father then exited the residence and ordered the representative to leave the premises.

Once the representative arrived at Memorial Hermann Hospital in The Woodlands, a nurse informed the representative that A.R. was born at twenty-seven weeks and was expected to be in the hospital for approximately ten more weeks. According to the affidavit, the social worker's notes stated that Mother had extensive CPS history in Oklahoma, and that although Mother had stated she had been off from work the two weeks prior, there were no notes in A.R.'s chart indicating his parents had visited him in the hospital.

The representative stated in the affidavit that he met with Mother and Father at the CPS office on August 12, 2021, and he immediately observed a foul odor coming from them. Mother informed the representative that she was diagnosed as bipolar, as having PTSD, and as having borderline personality disorder, but that she had not been on medications during her pregnancy. When the representative asked about previous domestic violence, Mother and Father told the representative they were going to set up marriage counseling. Mother and Father also said they were not using drugs at the time but they were "taking CBD oil[,]" and they agreed to take a drug test. The next day, Mother left a voicemail for the representative, and Mother stated that she spoke with an attorney and that the Department would have to get a

3

court order for Mother and Father to take a drug test or for the Department to enter their home.

According to the affidavit, the representative visited A.R. at the hospital on August 24, 2021, and the representative was informed that Mother and Father had communicated to the hospital that they had tested positive for COVID and that they had not been to the hospital nor calling to check on A.R. A.R. was still on a breathing machine at the hospital.

The affidavit detailed Mother's CPS history in Oklahoma as to a daughter that was not Father's child. The affidavit also detailed prior CPS history in Texas as to another daughter Mother and Father shared, N.R. According to that affidavit, N.R. was removed from Mother's and Father's custody due to Mother's mental health problems and Father's methamphetamine use, their parental rights to N.R. were terminated in December 2020 after Mother and Father did not successfully complete all requirements of their service plan, and Mother and Father subsequently relinquished their rights to N.R.

The affidavit also stated that both parents had a criminal history. Father was arrested in 2017 and convicted of the offense of unlawfully carrying a weapon and arrested in 2018 and convicted of the offenses of possession of marijuana in an amount less than two ounces and tampering/fabricating physical evidence with intent to impair.

The representative's affidavit stated the following:

[Mother] has ongoing issues with her mental health that place [A.R.] in danger. She is inconsistent with receiving treatment. There is excessive history with the parents in the case from both Texas and Oklahoma that remains unresolved. [A.R.] was born at 27 weeks and is fragile. [Father] has [a] history of methamphetamine use that was not mitigated during the previous case where parental rights of both parents were terminated. The previous case was from 2019-December 2020. The parents have a history of domestic violence and drug use. The Department is asking to be named Temporary Managing Conservator of [A.R.], so he can have a safe and sober medical consenter and be placed in a safe environment when discharged.

After a bench trial, the trial court signed a Final Order Affecting the Parent-Child Relationship and Order for Termination and found, by clear and convincing evidence, that statutory grounds exist for termination of Father's parental rights and that termination of his parental rights would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O), (2). Father timely appealed.

Evidence at Trial

Testimony of the Department's Investigator

An Investigator for the Department testified that he first received a call regarding the case in early August 2021 and that the initial report he received was regarding negligent supervision of A.R. by Mother and Father. The Investigator testified that during his investigation he visited A.R. twice in the hospital and that A.R., who was born two and a half months premature, was "on a breathing machine and in a medical crib." According to the Investigator, the hospital informed the

5

Investigator that A.R. was stable, A.R. had "a lot of needs that needed to be met[,]" and the hospital met those needs.

The Investigator testified that when he first contacted Mother and Father at their residence on August 9, 2021, the Investigator was not allowed to go into the residence, and Mother and Father told the Investigator to leave the property. According to the Investigator, Mother and Father "were pretty aggressive" and "not willing to answer any questions[]" when the Investigator approached them, and they questioned why the Department had a case because A.R. was in the NICU.

A few weeks later and during the legal proceedings, the Investigator took photographs inside a different residence where Mother and Father then lived, and they told the Investigator that they hoped to bring A.R. home from the hospital to that residence. The photographs were admitted into evidence. The Investigator testified that the residence was not an appropriate place for a newborn baby. According to the Investigator, there was an outdoor propane grill in the kitchen that was a potential fire hazard, there was a microwave but no other cooktop, there was no running water at the residence, there was drywall missing, wires were exposed, there were no sleeping arrangements for A.R., and the home was unsanitary. The Investigator testified that Mother and Father were not concerned about the exposed wiring, lack of drywall, or the outdoor cooktop inside, but that they were attempting

6

to repair the walls. On cross-examination, the Investigator admitted that he was not aware that Father had moved out of the residence eight months prior to trial.

The Investigator testified that Mother had a CPS history: two cases based in Oklahoma and one case in Texas. The Texas case involved Mother and Father's daughter, N.R., and they had relinquished their parental rights to N.R. The Investigator testified that when he asked Mother and Father to take a drug test, Mother told the Investigator that the Department would have to get a court order in order for Mother and Father to comply. According to the Investigator, he never received a drug test from Mother or Father while he investigated the case. The Investigator testified that although there was no information suggesting there was a drug issue relating to A.R.'s birth, he requested the drug tests due to "[p]ast history."

Testimony of the Department Caseworker

The Department Caseworker testified that she worked with Mother and Father regarding the family plan of service. The Caseworker testified that the Department had temporary custody of A.R. for at least nine months. According to the Caseworker, after A.R. was discharged she continued to inform Mother and Father about A.R.'s medical issues, and the Department never directed Mother and Father that they could not attend A.R.'s doctor visits. The Caseworker testified that she heard Father's testimony that he was at work during one of A.R.'s doctor's visits, but the Caseworker attended the appointment with A.R. that day and testified that

she saw Father in the vicinity dropping Mother off for the appointment and later she saw Mother getting into Father's car after the appointment. The Caseworker testified that for another appointment the pediatrician had a policy due to COVID and the facility's treatment of premature babies that only one person could attend the appointment with A.R. Because Mother and Father "were not the medical consenters[]" at the time, Mother and Father were not allowed at the appointment.

According to the Caseworker, the visits she observed between A.R. and Mother and Father did not go well as to Mother because Mother was "verbally aggressive" during many of the visits, and Mother and Father would argue with one another in A.R.'s presence. Once Mother and Father informed the Caseworker that they had decided that when A.R. returned home Father would be working full-time and Mother would be A.R.'s primary caretaker, the Department set up additional supervised visits for Mother to have alone with A.R. The Caseworker testified that she observed visits between Father and A.R. during the case and Father was appropriate with A.R., fed A.R., changed A.R.'s diaper, and there was nothing she observed during those visits that indicated that Father was unable to care for A.R.

The Caseworker testified that during visits between Mother and Father and A.R. dating back to the beginning of the case, the Caseworker could smell smoke on Mother and Father, and the Caseworker continued to smell smoke on both of them during visits through January or February. The Caseworker testified that she

8

frequently would remind Mother and Father that they were not to smoke around A.R. and that A.R. cannot be exposed to second- or third-hand smoke. Despite being reminded, Mother and Father continued to smoke. The Caseworker testified that at some point she learned that Mother and Father decided to vape instead, so the Caseworker provided documentation from A.R.'s pediatrician stating that A.R. was not to be around any type of smoke whether it was first-, second-, or third-hand, but Mother and Father did not quit vaping. The Caseworker testified that she witnessed Mother and Father vaping in the parking lot before and after their visits with A.R. and that the Caseworker told them that was not appropriate, but Mother and Father continued to vape before A.R.'s visits until April or May of 2022. The Caseworker acknowledged that she did not stop any of the visits when Mother and Father smelled of smoke, and she did not observe A.R. agitated or crying during those visits.

According to the Caseworker, the family plan of service required Father to complete various services. In November 2021, February 2022, and July 2022 she obtained service authorizations for Father to have a drug and alcohol assessment, and those service authorizations were admitted into evidence. According to the Caseworker, at the time of trial, Father had not completed his service plan for the domestic violence issues in this case, and he had not completed the drug assessments and classes.

9

The Caseworker testified that she believed it was in A.R.'s best interest for Father's parental rights as to A.R. to be terminated. According to the Caseworker, her belief was based on the fact that Father was still legally married to Mother, Father did not have a plan to take care of A.R. due to Father's work, and Father did not have a plan financially to take care of A.R. and meet A.R.'s needs, and based on Father's CPS history. The Caseworker testified that Father had drug issues in the CPS case involving his daughter, N.R., and that those drug issues have not been resolved in A.R.'s CPS case. The Caseworker testified she had concerns about Mother and Father's visits with A.R. when Mother and Father were verbally abusive towards each other in front of A.R., concerns about Mother being around A.R. if Father's parental rights were not terminated because she believed Mother was still involved with Father, and concerns that she had not observed that Father had exhibited the ability to meet A.R.'s special needs. The Caseworker testified that she had asked Father during the CPS case if he had names of placement options for A.R. but Father could not provide the Caseworker any names, and the first time the Caseworker had been given the names of Tyler, Oscar, Sherry, and David as possible placements for A.R. was during Father's testimony at trial.

Testimony of Dr. Victor Love

Dr. Victor Love testified that in this case the Department requested that he provide individual therapy for Father starting in March 2022. At the time of trial in

10

September 2022, Dr. Love was still treating Father. According to Love, he counseled Mother and Father together as a couple for fifteen sessions starting in February 2022, but those sessions ended when the couple separated in mid-June. Dr. Love testified that although he was not provided a lot of detail about A.R.'s special needs, it was Dr. Love's general understanding that A.R. needed physical and speech therapy and suffered from lung conditions and other conditions or developmental delays.

Dr. Love testified that the goals for Father's therapy treatment plan were to discuss the issues that led to CPS intervention, discuss Mother and Father's marital relationship and to try to make improvements with that, to discuss Mother's and Father's prior CPS history, and "to discuss their use of nicotine and other substances that created problems for them [and] for their medically fragile son." According to Dr. Love, Mother and Father denied having a substance abuse problem, but it was discussed "from time to time . . . [b]ecause they had a history of using, and it was one of the things that the Department was concerned about." Dr. Love testified that Father said that the Department claimed he was not visiting his son enough while his son was in the hospital and that the Department termed that as neglectful supervision. Father denied that he was neglectful and claimed there was a "24/7 nanny cam" where Father could check on A.R. if he did not come to the hospital.

11

Father reported past use of marijuana, cocaine, ecstasy, alcohol, synthetic marijuana, and "sort of a combination of meth[amphetamine] and ecstasy." Father reported that he stopped using everything but marijuana in 2019, but he admitted using marijuana until the case started. Father told Dr. Love that he had started drug use when he was an adolescent, that he had received substance abuse services in a prior CPS case, and that Father began outpatient substance abuse treatment with regard to this case the month prior to trial after he completed a drug assessment. Dr. Love also testified that, to his knowledge, Father did not seek substance abuse help during the pendency of the case until the month before trial. During the therapy sessions they discussed the detrimental effect of cigarette smoking or vaping or other types of smoking on A.R., who had a fragile medical condition.

Dr. Love stated that Mother and Father discussed domestic violence between them during their therapy sessions, but that Dr. Love thought that Father did not take the domestic violence with Mother very seriously. Dr. Love testified that from the therapy sessions it appeared that Mother was the aggressor in the domestic relationship. Dr. Love described Mother and Father's relationship as a married couple at times as "silly, immature, and . . . quite conflictual." According to Dr. Love, he and Father discussed the fact that Mother had relinquished her parental rights to A.R. and that, although Father seemed troubled by that fact, he "came to understand that it was a good choice."

12

Dr. Love testified he discussed with Father the need for Father to set up consistent day care for A.R. so Father could work full-time as a single father and that Father's finances needed to be in order for him to be able to care for and support A.R. According to Dr. Love, Father told him that he had friends who could provide day care or babysit and that he intended to pursue day care through government assistance, Father "didn't see that there was much he had to do[,]" and Father felt confident that he could care for A.R. Dr. Love testified that he believed Father had been continuously employed during the seven months of treatment prior to trial, but that Father had changed jobs and had four different employers during that time period in addition to an ongoing side job as a mechanic.

According to Dr. Love, Father reported having "seizures" periodically that were precipitated by either anxiety or stress, and Father reported that he suffered from "calcium deposits" throughout his body that he called "bone cancers[.]" Dr. Love testified that the seizures could be concerning. Father reported he had an appointment with a neurologist to address the seizures, but Dr. Love did not know whether Father attended the appointment. Father reported having his last seizure right after A.R.'s birth, when A.R. was in the NICU.

According to Dr. Love, Father had met the initial goals for therapy. Dr. Love testified that a large amount of conflict for Father was his relationship with Mother and that, since Father's separation from Mother, Father reported being happier and

13

less stressed. Based on Mother's and Father's financial struggles, Dr. Love felt like Father could benefit with further sessions regarding budgeting so that he could be more able to "demonstrate a lot more understanding and ability to be able to provide his son with all the medical needs, treatment services that he has, and day care because as a single dad, he needs to be working." Dr. Love felt that subsequent goals that he had for Father that had not yet been met were for Father to "further explore his ability to manage his finances and truly understand clearly what it would take to support himself and a child with - - particularly with a lot of medical needs and appointments and day care."

Father's Testimony

Father testified that at the time of trial, his son, A.R., was a year and three months old. According to Father, A.R. was born premature with undeveloped lungs and was in a fragile medical condition. Father testified that A.R. was in the hospital for three or four months after his birth and Father visited A.R. at the hospital regularly. According to Father, the Investigator told him when A.R. was released from the hospital and removed to the Department's custody that Father was no longer allowed to know anything about A.R.

Father testified that he had a six-year-old daughter with another woman with whom he shared custody, and he visited that daughter every weekend. He also had a three-year-old daughter, N.R., with Mother, he relinquished his parental rights to

N.R. less than two years before this trial, and his parental rights to N.R. were terminated while he was still married to Mother. According to Father, he relinquished his parental rights as to N.R. because he was unstable at the time and "was in between houses." Father testified that since the start of this case he has had two different full-time jobs: a fast-food restaurant where he worked for eight months and at a warehouse where he has worked for two months. Father testified that he did not know the name of his current employer at the warehouse, but that he provided the Caseworker proof of employment that identified his employer, and he worked Monday through Friday from "[e]ight to five."

Father testified that at the time of trial, "[s]adly[]" he was still married to Mother. He had filed for divorce in June 2020 during his CPS case regarding his daughter, N.R. According to Father, he filled out the petition himself and the document asked what visitation Mother should have and he responded that Mother should have zero contact because she was "unfit." Father admitted he had nonetheless stayed together with Mother despite believing she was unfit and then they had another child, A.R. Father testified that at the time of trial he and Mother were separated because she relinquished her parental rights to A.R. and she committed adultery. Father testified that since the start of trial he no longer was in contact with Mother. Father admitted that in the other CPS case with N.R., their

15

daughter, he and Mother had domestic disputes and two of the disputes were physical with Mother being the aggressor.

Father testified that in this case his service plan required him to complete a Batterers Intervention Prevention Program because the domestic violence between him and Mother was still an issue for the Department. According to Father, he did not remember completing that program or getting a certificate for completing the program. Father also testified that the Department had concerns in this case that he had a drug issue, and his service plan required him to do a drug and alcohol assessment, but he waited and did not complete the assessment until the month before trial. At the time of trial, he had started sessions relating to that assessment but had not completed them, and the drug and alcohol assessment that he completed in this case indicated he needed more classes despite him completing a drug and alcohol program during the case relating to his daughter with Mother. Father testified he had been working on his drug treatment program for about a month and only had a couple of weeks left, and with the program he had three individual and three group sessions a week.

Father admitted he did not have a valid Texas driver's license because he was "in the process of paying it[,]" and his license had not been valid for a number of years. Father testified that the impediment to him getting a driver's license was that he received a speeding ticket "about a year ago that [he was] currently paying off."

Father testified that he suffered from nonepileptic seizures that caused him to "black out[,]" that he last suffered one of these seizures at the beginning of this case and had to go to the emergency room, and he has not been prescribed medicine because his appointment with a neurologist was not for a few more months. According to Father, he waited to take care of the neurological problem because it took him some time to "get on insurance."

Father admitted that during this case he had acknowledged having a drug or alcohol problem. Father testified that the most recent Narcotics Anonymous or Alcoholics Anonymous session he attended was the Saturday of the week of trial and that he had an NA sponsor in the previous case but did not have a sponsor at the time of trial. Father testified that CPS asked him to drug test every two or three months during this case and that he has been drug free since the start of the case. On cross-examination, Father admitted that he had tested positive for marijuana in October 2021 after this case had started, but he said he tested positive because "Delta-8 is not illegal, but it's still positive as marijuana or THC[]" on a drug test. Father acknowledged that A.R.'s medical condition required A.R. to not be around smoke, and Father testified that he quit smoking cigarettes in January 2022 and quit vaping in April 2022. According to Father, he did not know for some time that A.R. should not be exposed to second-hand smoke, and he did not know for some time that vaping around A.R. could cause him harm.

17

Father characterized A.R.'s medical condition as "special needs[]" and although Father said he was not completely informed of A.R.'s needs, he understood that A.R. was going to always have special needs, needed to be on a special diet prepared at home "from scratch[,]" had many doctor's appointments, had physical therapy once a week, and needed a "practically germ-free environment." Father testified he could provide a practically germ-free environment in his current home because he was "pretty well a germ freak[.]" Father admitted he had never had sole custody or raised a child as a single parent. He testified that he or his brother could take A.R. to his weekly physical therapy appointments even if it meant taking off from work. Father testified his current warehouse employment was forty hours per week making between $3000 and $4000 a month. He testified he also has a side job as a mechanic. He testified his rent was $1000 a month plus utilities.

Father planned on putting A.R. in day care while Father worked but he did not know the cost of day care because he had not found one yet that he liked. He found one day care that could accommodate A.R.'s special needs that was $215 a week, but Father did not like that day care, and the other day care centers he looked into for A.R. cost from $150 to $300 per week. Father testified that if A.R. was sick or unable to go to day care, Father had family – "Tyler, Oscar, [Father's] adoptive mother Charity, [Father's] adopted brother David[]" – with whom A.R. could stay in the area. Father admitted those individuals had never met A.R.

Father testified he lived in an RV that had one bedroom, two bunk beds, one bathroom, and working utilities. Father testified that he had a crib, car seat, stroller, toys, and clothes at his RV for A.R. According to Father, the Court Appointed Special Advocate, the ad litem, and another person came to visit his current home once, but he did not think anyone from CPS came to look at it. He acknowledged that the RV he was living in at the time of trial was a different trailer from the one where he initially lived earlier in the case.

According to Father, over the last two years he had suffered from six or seven seizures, his most recent seizure was eight months prior to trial, and the seizures were caused by stress. Father testified that he worked with Dr. Love on coping mechanisms and reducing stress. Father testified that he believed he had addressed his domestic violence issues in this case, but he admitted that he did not use Batterers Intervention Prevention Program or any other source on a regular basis.

Testimony of A.R.'s Foster Mother

A.R.'s Foster Mother (Foster Mother) testified she was notified about A.R. on October 26, 2021, and she visited him at the NICU at Memorial Hermann every day until he was discharged, and A.R. came home with her on November 1, 2021. Foster Mother testified that on October 26th her understanding of A.R.'s diagnosis was "bronchopulmonary dysplasia so extremely weak lungs[,]" a minor brain bleed, a valve problem in his heart where his valve had not sealed completely, retinopathy of

prematurity so he did not have complete use of his eyesight, and he was severely underweight.

Foster Mother testified that she and her husband participated in training at the hospital during that week on how to care for A.R. before she was allowed to leave the NICU with A.R., and she and her husband had to do an overnight stay as well. According to Foster Mother, on the recommendation of A.R.'s doctor, A.R. was put on a strict diet and feeding schedule when discharged, and Foster Mother had to make puree at home from a mixture of protein, fat, and carbs in order to keep A.R.'s weight up and use a lot of herbs to help with A.R.'s acid reflux and indigestion issues. Foster mother testified that A.R. was required to continue that diet to stay the proper weight. Foster Mother testified as follows regarding A.R.'s medical condition at the time of trial:

> The lung problem is still persistent. He no longer has the eye issues or the heart problems. We have not had to see a follow-up with cardiology. That could change as he gets older. The brain bleed we will not see whether or not that had an effect on his life until he starts going to school. That could cause mental delays in his education and then he is finally no longer considered a high-risk weight category as of a week ago. So he's finally stable weight as of last week.

According to Foster Mother, A.R. saw a physical therapist every two weeks and she or her husband facilitated A.R.'s at-home physical therapy on average six out of seven days a week. Foster Mother explained that A.R. needed physical therapy because he had abnormal movement patterns because of being premature, and the

20

physical therapy helped "unteach" incorrect patterns. Foster Mother explained that recent at-home therapy required both her and her husband to assist because A.R. had gotten older and bigger. Foster Mother testified she had seen physical improvement with A.R. and, based on information from his therapist, Foster Mother believed A.R. would continue physical therapy until he was old enough to attend school. Foster Mother testified that she also monitored A.R.'s hydroceles, or excess fluid in his testicles which put him at a higher risk of hernias in the groin area. Foster Mother testified that, in addition to the physical therapy at home, A.R. usually had four or five medical or therapeutic appointments each month. Foster Mother explained that although A.R. was not considered "special needs" because he had no mental delay, there were still long-term concerns for A.R. because his lungs were weaker than the average child, "he's always at a higher risk of wheezing and aspirating, and then also his brain bleed could come back to cause issues later." Foster Mother testified that when they first met with A.R.'s doctor, the doctor told Foster Mother that A.R. could not be exposed to smoke or air irritants. According to Foster Mother, A.R. was behind physically, verbally, and cognitively, and his preventative care would be "very long-term[.]" Foster Mother testified that A.R. was "hypoallergenic" and had severe acid reflux. Foster Mother testified she and her husband were an "adoption-eligible household[,]" and they wanted to adopt A.R. if his parents' parental rights were terminated.

21

Testimony of the Court-Appointed Special Advocate

The Court-Appointed Special Advocate ("CASA") testified that she was appointed August 29, 2021, she visited Father's home, and she found the home to be appropriate for A.R. with no issues regarding cleanliness. She testified she saw a car seat but did not see a crib or any clothing for a child at the home. The CASA testified that she observed visits between Mother and Father and A.R. and, although some visits were appropriate, the interaction between Mother and Father during some visits was not appropriate and Mother would "burst out and leave and [Father] would stay with [A.R.] by himself."

According to the CASA, A.R. needs a different level of care than a normal one-and-a-half-year-old or two-year-old and

> [h]e needs all the things that [the foster parents] are doing for him to be able to continue to progress because he's got all the development issues and lung issues. I don't think that if it was for the hard work they've put into helping him, he would be where he's at right now.

When asked whether she thought Father had the ability to do the things that she observes A.R.'s foster parents doing with A.R., the CASA responded that although she had observed the visits between Father and A.R., Father appeared connected with A.R. but there had not been enough interaction for her to say confidently that Father had the ability to do all the things Foster Mother does for A.R. The CASA was concerned that Father had not completely addressed his drug problem and his domestic violence issues. The CASA felt that all the things in Father's service plan

22

were necessary for him to be able to obtain A.R. back, and the CASA was concerned that Father did not complete his service plan. The CASA was also concerned that Father continued to smoke or vape for many months after he was asked to stop, and that even after Father made assurances he would stop, the CASA saw Father continuing to smoke or vape. According to the CASA, she was not in agreement with a monitored return home to Father, but she also was not completely in agreement with the Department's request to terminate Father's parental rights. She did not believe it was in A.R.'s best interest to live with Father, and she believed it was in A.R.'s best interest to stay with his foster parents.

Other Evidence

The Affidavit of Voluntary Relinquishment of Parental Rights to the Department of Family and Protective Services executed by Father in 2020 as to his daughter with Mother was admitted into evidence. The order terminating Mother's and Father's parental rights to their daughter, N.R., in 2020 was also admitted into evidence. A copy of Father's petition for divorce filed in 2020 wherein he alleged Mother "should have zero contact" with their daughter because "she [was] unfit" was admitted into evidence. The court-ordered family service plan was admitted into evidence, and it required Father to obtain and maintain appropriate housing; demonstrate the ability to obtain/maintain employment; participate in parenting classes; obtain a drug assessment and follow all recommendations; participate in

23

therapy in order to demonstrate his ability to provide for A.R. with care and nurture; participate and complete services to address domestic violence in order to learn the ability to avoid domestic violence; complete a psychological evaluation and follow all recommendations by the psychologist; and develop a larger group of family and friends for support. The status hearing order was also admitted into evidence.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved the disputed facts in favor of its finding if a reasonable factfinder

could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Only one statutory ground under section 161.001(b) is required to terminate parental rights. *See In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019). "All evidentiary standards, including clear and convincing evidence, recognize the relevance of circumstantial evidence." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015); *see also In re R.H.W. III*, 542 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Analysis

In his first issue, Father challenges the sufficiency of the evidence under the predicate finding of subsection E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). In his second issue, Father argues that his family service plan was ambiguous and did not give him the notice required under the statute, and therefore, subsection O cannot serve as a ground for terminating his parental rights. *See id.* § 161.001(b)(1)(O).

For purposes of subsection E, endangerment means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Id.* § 161.001(b)(1)(E); *In re M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.). Termination under subsection E requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re M.L.L.*, 573 S.W.3d at 363-64. A parent's conduct that subjects a child's life to instability and uncertainty endangers the emotional or physical well-being of a child. *Id.* at 363. Endangerment is not limited to actions directed toward the child and includes the parent's actions before the child's birth and while the parent had custody of older children. *In re J.O.A.*, 283 S.W.3d at 345. Abusive or violent conduct by a parent may also produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use actually injured

26

the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *See In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). A parent's drug use, incidents of domestic violence, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder may determine the parent endangered the child's emotional and physical well-being. *See In re N.F.*, No. 09-19-00435-CV, 2020 Tex. App. LEXIS 3650, at *66 (Tex. App.—Beaumont Apr. 30, 2020, pet. denied) (mem. op.). "[N]eglect can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). A parent who continually exposes the child to unsanitary living conditions, continued uncleanliness, and the lack of attention to medical needs is evidence of endangering environment. *See id.* at 269-70. In addition, a court may consider a parent's failure to complete a service plan as part of its analysis of endangering conduct. *See In re N.F.*, 2020 Tex. App. LEXIS 3650, at *67.

The record demonstrates that A.R. was born premature at twenty-seven weeks, and hospital notes in A.R.'s chart do not indicate his parents ever visited him in the hospital. Despite testimony that there was a "24/7 nanny cam" at the hospital that Father could watch, the affidavit attached to the petition noted that A.R.'s parents had failed to call and check on A.R. at the hospital. The record also demonstrates that Father relinquished his parental rights to an older child with Mother, he did not complete his service plan in that case, and that his parental rights were terminated as to that child in 2020. Father had a criminal history and a history of methamphetamine use that was not mitigated during the previous CPS case where his parental rights were terminated.

Although at trial Father testified that he was in a different RV, photographs of the home where he and Mother had intended to live when A.R. was born and which were from the beginning of the case were admitted into evidence and the Investigator testified as to the potential hazards in the home and that it was unsanitary, had no running water, and was not appropriate for a newborn baby. Father admitted during the case he had a previous drug problem. The trial court heard the Investigator's testimony that while he investigated the case Father did not take a drug test despite the Investigator's request for drug testing. A parent's refusal to submit to drug testing may be considered as evidence that he or she is continuing to abuse drugs. *In re O.G.H.D.*, No. 09-21-00172-CV, 2021 Tex. App. LEXIS 8002, at *28 (Tex. App.—

Beaumont Sept. 30, 2021, no pet.) (mem. op.) (citing *In re T.R.L.*, No. 10-14-00290-CV, 2015 Tex. App. LEXIS 2178, at *14 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) (trial court could reasonably infer parent avoided taking drug tests because she was using drugs)). Father admitted that he had tested positive for marijuana in October 2021(after this case was filed). Dr. Love testified that Father had reported past use of marijuana, cocaine, ecstasy, alcohol, synthetic marijuana, and "sort of a combination of meth[amphetamine] and ecstasy." Dr. Love testified that Father reported he was still using marijuana until this case began. The trial court also heard the Caseworker testify that despite her obtaining service authorizations earlier in the case, Father did not have a drug assessment until a month before trial. Although Father denied using drugs at the time of trial, the trial court heard Father's testimony that he had a history of using drugs, he did not complete the drug treatment required by the family service plan, and he did not have an NA sponsor.

The trial court heard the extensive medical needs of A.R. and that the care required for his special needs would extend into the future. The trial court heard that any kind of smoke exposure to A.R. was detrimental to A.R.'s health due to A.R.'s weak lungs, and that despite constant instructions to Father to stop smoking or vaping he continued to do so during the case. The trial court heard testimony that

A.R. required a "practically germ-free environment" for health reasons, and photographs of Father's residence at the beginning of the case were admitted into evidence, and even though Father had moved into another RV by the time of trial, the trial court could have concluded from the earlier photographs that Father was unable to consistently provide a sanitary environment for A.R. The Caseworker testified that Father did not have a plan to care for A.R. while Father worked, nor did he have a plan of how he could care for A.R. and his special needs. The trial court heard testimony that Father suffered from seizures that caused him to "black out[,]" that the seizures were brought on by stress, Father had suffered a seizure since A.R.'s birth, and, as of the time of trial, Father had not yet seen a neurologist. The trial court also heard testimony from Father that he or his brother would take A.R. to any necessary medical appointments but also heard testimony that Father and his brother both worked.

The trial court heard testimony that Father had not completed items required in the family service plan, such as substance abuse treatment and completion of services related to domestic violence issues. The trial court heard evidence that during the case Father had changed housing and employment and the trial court could have considered all of this when assessing Father's stability. Father testified that he relinquished his rights to his daughter, N.R., in the prior CPS case because he was "unstable" then and "was in between houses." The trial court heard Dr. Love

testify that he felt Father needed further sessions regarding budgeting and being able to demonstrate that he could be able to care for A.R. while being a working, single Father. Despite Father's testimony that he could financially provide for A.R., the trial court also heard Father's testimony that he had not obtained a valid Texas driver's license in over a year because of a speeding ticket he was working to pay off and he had not seen a neurologist for his seizures because he was waiting to obtain insurance.

The trial court heard testimony that Father was still legally married to Mother at the time of trial and that he fathered another child with Mother, despite feeling she was an unfit mother and despite the fact she was abusive towards Father. Father testified that there was a history of domestic abuse between him and Mother, and Dr. Love testified that he did not feel Father was serious about addressing the domestic violence with Mother. The trial court heard the Caseworker's testimony that she had concerns about Mother being around A.R. if Father's parental rights were not terminated because she believed Mother was still involved with Father, and concerns that she had not observed that Father had exhibited the ability to meet A.R.'s special needs.

The trial court heard the Caseworker's testimony that she believed it was in A.R.'s best interest for Father's parental rights to be terminated and the CASA's testimony that she did not believe it was in A.R.'s best interest at the time of trial to

31

live with Father. The trial court also heard the CASA state she was also not sure that termination of the Father's rights was in the best interest of the child, and the CASA believed it was in the child's best interest to remain in the care of the foster parents.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the finding under subsection E, as we must, the trial court could reasonably have formed a firm belief or conviction that Father's conduct endangered A.R.'s well-being. We conclude that the Department established, by clear and convincing evidence, that Father committed the predicate act enumerated in subsection E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Further, considering the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that the finding under subsection E is true. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule issue one.

In issue two, Father contends that his service plan was not sufficiently specific to support termination of his parental rights under subsection O. Under subsection O, "[t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence: [the parent] failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(O).

32

"The department . . . must write the service plan in a manner that is clear and understandable to the parent in order to facilitate the parent's ability to follow the requirements of the service plan." *Id.* § 263.102(d). "Because a trial court must necessarily decide that a court order is sufficiently specific for the parent to comply before terminating a parent's rights under section 161.001(b)(1)(O), a trial court cannot terminate parental rights for failure to comply without first considering the order's specificity." *In re N.G.*, 577 S.W.3d 230, 239 (Tex. 2019).

Father argues that his service plan did not specifically require him to complete drug classes or complete a batterer's intervention program (or other domestic violence prevention program). As to these tasks, the family service plan outlined the following requirements for Father in relevant part[3]:

Substance Abuse/Use

. . . .

Required Action:

SUBSTANCE ABUSE SERVICES
[Father] will obtain a drug assessment to evaluate his need for treatment associated with substance abuse issues. [Father] will have to follow recommendations made by the provider. . . .

. . . .

Intimate Partner Violence

---

[3] The family service plan noted on each page of these requirements that "*All services must be completed by the commencement of trial[.]*"

33

. . . .

Required Action:

BIPP/DOMESTIC VIOLENCE PROGRAM
[Father] will actively participate and complete in specialized services to address domestic violence. He will need to learn the ability of avoiding domestic violence. [Father] will provide the caseworker original certificate of completion.

Regarding these tasks, Father testified at trial as follows:

[Department's Counsel]: . . . . And so in your family plan of service, the Department asked for you to complete a BIPP program, Batterers Intervention Prevention Program, correct?

[Father]: I believe so.

[Department's Counsel]: All right. And you did not do that, correct?

[Father]: I can't recall. I've done a lot for CPS. So I can't recall whether I've completed it or not.

[Department's Counsel]: Okay. So . . . you don't know if you've ever done a BIPP program?

[Father]: Yeah. I have no idea.

[Department's Counsel]: Okay. So you don't know if you've done a program that particularly and only addressed your issues as a victim in domestic violence?

[Father]: I don't think I have.

[Department's Counsel]: Okay. And you would have gotten a certificate from that. So did you ever get a certificate --

[Father]: No.

34

. . . .

[Department's Counsel]: . . . . So do you have any remembrance of the fact that the judge ordered you to do the services that were in the family plan of service?

[Father]: Yes, ma'am.

[Department's Counsel]: You realize that a violation of that would be very serious and could create a situation where your rights would be restricted or terminated?

[Father]: Yes, ma'am.

[Department's Counsel]: Did you understand that since you were here at every hearing?

[Father]: Yes, ma'am.

. . . .

[Department's Counsel]: And you didn't do BIPP at all, correct?

[Father]: Yes, ma'am.

. . . .

[Department's Counsel]: . . . . And so even though you waited all this time to do your drug and alcohol assessment, you did start some sessions?

[Father]: Yes, ma'am.

[Department's Counsel]: But you're not done, are you?

[Father]: I'm already halfway through.

[Department's Counsel]: Okay. But you're not done today?

35

| | |
|---|---|
| [Father]: | No. |

. . . .

| | |
|---|---|
| [Department's Counsel]: | [T]he drug and alcohol assessment that you took in August of this year indicated that you needed more help, correct? |
| [Father]: | I'm guessing. |
| [Department's Counsel]: | Well, you're going to classes, aren't you? |
| [Father]: | Yes, ma'am. |

The status hearing order that was admitted into evidence and that was entered earlier in the case included the following finding:

> The Court finds that [Father] has reviewed and understands the service plan and has been advised that unless he is willing and able to provide the child with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, his parental and custodial duties and rights may be subject to restriction or to termination or the child may not be returned to him.

Father testified that his service plan required him to do a drug and alcohol assessment. At the time of trial, he had started sessions relating to that assessment but had not completed them, and the drug and alcohol assessment that he completed in this case indicated he needed more classes despite him completing a previous drug and alcohol program during the other case relating to his daughter with Mother. Father testified he had been working on his drug treatment program for about a month and only had a couple of weeks left, and with the program he had three individual and three group sessions a week.

36

On this record, the family service plan specifically established that Father was required to follow the recommendations after the drug assessment (which testimony established included drug classes), and the service plan specifically established that Father was required to complete a batterer's intervention prevention program or other domestic violence prevention program. Father testified that he did not complete the drug classes and did not complete a batterer's intervention program. We overrule issue two. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O); *In re N.G.*, 577 S.W.3d at 239. Having overruled Appellant's issues on appeal,[4] we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 24, 2023
Opinion Delivered February 9, 2023

Before Golemon, C.J., Johnson and Wright, JJ.

---

[4] On appeal, Father does not challenge the trial court's finding as to best interest.